IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MOTIVATION INNOVATIONS, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 13-957-SLR |
| | ) | |
| PETSMART, INC. | ) | |
| | ) | |
| Defendant. | ) | |

Steven J. Balick, Esquire, Tiffany Geyer Lydon, Esquire and Andrew C. Mayo, Esquire of Ashby & Geddes, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Gary W. Smith, Esquire and Jon C. Cowen, Esquire of Posternak Blankstein & Lund LLP.

Arthur G. Connolly, III, Esquire, Ryan P. Newell, Esquire and Mary I. Akhimien, Esquire of Connolly Gallagher LLP, Wilmington, Delaware. Counsel for Defendant. Of Counsel: Ramsey M. Al-Salam, Esquire and Kevin A. Zeck, Esquire of Perkins Coie LLP.

**MEMORANDUM OPINION**

Dated: January 12, 2016
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

On May 30, 2013, plaintiff Motivation Innovations, LLC ("plaintiff") filed the instant patent infringement action against defendant Petsmart Inc. ("defendant") alleging infringement of U.S. Patent No. 5,612,527 C1 ("the '527 patent"). (D.I. 1) On June 20, 2013, defendant answered the complaint.[1] (D.I. 6) Presently before the court is defendant's motion for judgment on the pleadings. (D.I. 45) The court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

## II. BACKGROUND

Plaintiff is a Delaware corporation with a principal place of business in Boca Raton, Florida. Defendant is a Delaware corporation with its principal place of business in Phoenix, Arizona. (D.I. 1) The '527 patent, titled "Discount Offer Redemption System and Method," was filed on March 31, 1995 and issued on March 18, 1997. An ex parte reexamination of the '527 patent was completed on April 27, 2010 with original claims 1-16 confirmed, original claims 17-20 confirmed with amendment (or depending from an amended claim), and new claims 21-39 allowed. Plaintiff asserts infringement of claims 1, 12, and 16-17.

## III. STANDARD OF REVIEW

When deciding a Rule 12(c) motion for judgment on the pleadings, a district court must view the facts and inferences to be drawn from the pleadings in the light most favorable to the non-moving party. *Green v. Fund Asset Mgmt., L.P.*, 245 F.3d 214, 220 (3d Cir. 2001); *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 406

---

[1] Defendant's counterclaim was voluntarily dismissed on July 8, 2013. (D.I. 8)

(3d Cir. 1993). The motion can be granted only if no relief could be afforded under any set of facts that could be provided. *Turbe v. Gov't of the Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991); *see also Southmark Prime Plus, L.P. v. Falzone*, 776 F. Supp. 888, 891 (D. Del. 1991); *Cardio-Medical Associates, Ltd. v. Crozer-Chester Medical Ctr.*, 536 F. Supp. 1065, 1072 (E.D. Pa. 1982) ("If a complaint contains even the most basic of allegations that, when read with great liberality, could justify plaintiff's claim for relief, motions for judgment on the pleadings should be denied."). However, the court need not adopt conclusory allegations or statements of law. *In re General Motors Class E Stock Buyout Sec. Litig.*, 694 F. Supp. 1119, 1125 (D. Del. 1988). Judgment on the pleadings will only be granted if it is clearly established that no material issue of fact remains to be resolved and that the movant is entitled to judgment as a matter of law. *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290 (3d Cir. 1988).

## IV. DISCUSSION

### A. 35 U.S.C. § 101

Section 101 provides that patentable subject matter extends to four broad categories, including: "new and useful process[es], machine[s], manufacture, or composition[s] of matter." 35 U.S.C. § 101; *see also Bilski v. Kappos*, 561 U.S. 593, 601 (2010) ("*Bilski II*"); *Diamond v. Chakrabarty*, 447 U.S. 303, 308 (1980). A "process" is statutorily defined as a "process, art or method, and includes a new use of a known process, machine manufacture, composition of matter, or material." 35 U.S.C. § 100(b). The Supreme Court has explained:

> A process is a mode of treatment of certain materials to produce a given result. It is an act, or a series of acts, performed upon the subject-matter to be transformed and reduced to a different state or thing. If new and useful, it is just as patentable as is a piece of machinery. In the language

2

> of the patent law, it is an art. The machinery pointed out as suitable to perform the process may or may not be new or patentable; whilst the process itself may be altogether new, and produce an entirely new result. The process requires that certain things should be done with certain substances, and in a certain order; but the tools to be used in doing this may be of secondary consequence.

*Diamond v. Diehr*, 450 U.S. 175, 182-83 (1981) (internal quotations omitted).

The Supreme Court recognizes three "fundamental principle" exceptions to the Patent Act's subject matter eligibility requirements: "laws of nature, physical phenomena, and abstract ideas." *Bilski II*, 561 U.S. at 601. In this regard, the Court has held that "[t]he concepts covered by these exceptions are 'part of the storehouse of knowledge of all men ... free to all men and reserved exclusively to none.'" *Bilski II*, 561 U.S. at 602 (quoting *Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 130 (1948)). "[T]he concern that drives this exclusionary principle is one of pre-emption," that is, "'that patent law not inhibit further discovery by improperly tying up the future use of' these building blocks of human ingenuity." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, — U.S. —, 134 S.Ct. 2347, 2354 (2014) (citing *Bilski II*, 561 U.S. at 611-12 and *Mayo Collaborative Servs.v. Prometheus Labs., Inc.*, 566 U.S. —, 132 S.Ct. 1289, 1301 (2012)).

Although a fundamental principle cannot be patented, the Supreme Court has held that "an application of a law of nature or mathematical formula to a known structure or process may well be deserving of patent protection," so long as that application would not preempt substantially all uses of the fundamental principle. *Bilski II*, 561 U.S. at 611 (quoting *Diehr*, 450 U.S. at 187) (internal quotations omitted); *In re Bilski*, 545 F.3d 943, 954 (Fed. Cir. 2008) ("*Bilski I*"). The Court has described the

3

> framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts. First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts. If so, we then ask, "[w]hat else is there in the claims before us?" To answer that question, we consider the elements of each claim both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application. We have described step two of this analysis as a search for an "'inventive concept'"—i.e., an element or combination of elements that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself."

*Alice*, 134 S.Ct. at 2355 (citing *Mayo*, 132 S.Ct. at 1294, 1296-98).[2]

"[T]o transform an unpatentable law of nature into a patent-eligible application of such a law, one must do more than simply state the law of nature while adding the words 'apply it.'" *Mayo*, 132 S.Ct. at 1294 (citing *Gottschalk v. Benson*, 409 U.S. 63, 71-72 (1972)) (emphasis omitted). It is insufficient to add steps which "consist of well-understood, routine, conventional activity," if such steps, "when viewed as a whole, add nothing significant beyond the sum of their parts taken separately." *Mayo*, 132 S. Ct. at 1298. "Purely 'conventional or obvious' '[pre]-solution activity' is normally not sufficient to transform an unpatentable law of nature into a patent-eligible application of such a law." *Id.* (citations omitted). Also, the "prohibition against patenting abstract ideas 'cannot be circumvented by attempting to limit the use of the formula to a particular technological environment' or adding 'insignificant post-solution activity.'" *Bilski II*, 561

---

[2] The machine-or-transformation test still may provide a "useful clue" in the second step of the *Alice* framework. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014) (citing *Bilski II*, 561 U.S. at 604 and *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Can.*, 687 F.3d 1266, 1278 (Fed. Cir. 2012). A claimed process can be patent-eligible under § 101 if: "(1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing." *Bilski I*, 545 F.3d at 954, *aff'd on other grounds, Bilski II*, 561 U.S. 593.

4

U.S. at 610-11 (citation omitted). For instance, the "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 134 S.Ct. at 2358. "Given the ubiquity of computers, wholly generic computer implementation is not generally the sort of 'additional featur[e]' that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself.'" *Id.* (citations omitted).

Because computer software comprises a set of instructions,[3] the first step of *Alice* is, for the most part, a given; i.e., computer-implemented patents generally involve abstract ideas. The more difficult part of the analysis is subsumed in the second step of the *Alice* analysis, that is, determining whether the claims "merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet," or whether the claims are directed to "a problem specifically arising in the realm of computer technology" and the claimed solution specifies how computer technology should be manipulated to overcome the problem. *DDR Holdings, LLC v. Hotels.Com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014).

In *DDR*, for example, the claims at issue involved computer technology directed at retaining website visitors.[4] In its analysis, the Federal Circuit rejected the notion that the pre-Internet analog to the claims at issue ended the inquiry, explaining that while

---

[3] Or, to put it another way, software generally comprises a method "of organizing human activity." *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1367-68 (Fed. Cir. 2015) (citing *Alice*, 134 S.Ct. 2351-52, and *Bilski II*, 561 U.S. at 599).
[4] In *DDR*, representative claim 19 of the '399 patent recites:

> A system useful in an outsource provider serving web pages offering commercial opportunities, the system comprising:

5

> the "store within a store" concept . . . may have been well-known by the relevant time frame, that practice did not have to account for the ephemeral nature of an Internet "location" or the near-instantaneous transport between these locations made possible by standard Internet communication protocols, which introduces a problem that does not arise in the "brick and mortar" context.

773 F.3d at 1258. In other words, "[a]lthough the claims address[ed] a business challenge . . ., it [was] a challenge particular to the Internet." *Id.* at 1257. The Court concluded that, under any of the characterizations of the abstract idea, the claims satisfied step two of *Alice* as being

> different enough in substance from those in *Ultramercial* because they do not broadly and generically claim "use of the Internet" to perform an abstract business practice (with insignificant added activity). Unlike the

---

> (a) a computer store containing data, for each of a plurality of first web pages, defining a plurality of visually perceptible elements, which visually perceptible elements correspond to the plurality of first web pages;
> (i) wherein each of the first web pages belongs to one of a plurality of web page owners;
> (ii) wherein each of the first web pages displays at least one active link associated with a commerce object associated with a buying opportunity of a selected one of a plurality of merchants; and
> (iii) wherein the selected merchant, the out-source provider, and the owner of the first web page displaying the associated link are each third parties with respect to one other;
> (b) a computer server at the outsource provider, which **computer server** is coupled to the computer store and **programmed to**:
> (i) receive from the web browser of a computer user a signal indicating activation of one of the links displayed by one of the first web pages;
> (ii) automatically identify as the source page the one of the first web pages on which the link has been activated;
> (iii) in response to identification of the source page, automatically retrieve the stored data corresponding to the source page; and
> (iv) using the data retrieved, automatically generate and transmit to the web browser a second web page that displays:
> (A) information associated with the commerce object associated with the link that has been activated, and
> (B) the plurality of visually perceptible elements visually corresponding to the source page.

773 F.3d at 1249-50 (emphasis added).

> claims in *Ultramercial*, the claims at issue here specify how interactions with the Internet are manipulated to yield a desired result – a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink. . . .
>
> In sum, [U.S. Patent No. 7,818,399]'s claims are unlike the claims in *Alice*, *Ultramercial*, *buySAFE*, *Accenture*, and *Bancorp* that were found to be "directed to" little more than an abstract concept. To be sure, the '399 patent's claims do not recite an invention as technologically complex as an improved, particularized method of digital data compression. But nor do they recite a commonplace business method aimed at processing business information, applying a known business process to the particular technological environment of the Internet, or creating or altering contractual relations using generic computer functions and conventional network operation, such as the claims in *Alice*, *Ultramercial*, *buySAFE*, *Accenture*, and *Bancorp*.

*Id.* at 1258-59 (citing *Alice*, 134 S.Ct. at 2359; *Ultramercial*, 772 F.3d 709, 714-16 (Fed. Cir. 2014); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014); *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1344-45 (Fed. Cir. 2013); *Bancorp*, 687 F.3d at 1277-78); *but see Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1331-35 (Fed. Cir. 2012).

In *DDR*, the analytical framework (in the context of computer-implemented inventions) was articulated so as to require that the inventive concept "recite a specific way" to solve a "particular Internet-centric problem," with the claimed solution being "necessarily rooted in computer technology," so that the result "is not merely the routine or conventional use of the Internet." 773 F.3d at 1257, 1259. Since providing that explanation, the Federal Circuit has not preserved the validity of any other computer-implemented invention under § 101.[5] For instance, in *Intellectual Ventures*, a case that

---

[5] *See, e.g., Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343 (Fed. Cir. 2014); *Allvoice Devs. US, LLC v. Microsoft Corp.*, Civ. No. 2014-1258, 2015 WL 2445055, — Fed. Appx. — (Fed. Cir. 2015); *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359 (Fed. Cir. 2015); *Internet Patents Corp. v. Active*

also presented claims directed at websites,[6] the Court explained that, "[a]t step one of the *Alice* framework, it is often useful to determine the breadth of the claims in order to determine whether the claims extend to cover a "'fundamental . . . practice long prevalent in our system.'" *Intellectual Ventures*, 792 F.3d at 1369 (citing *Alice*, 134 S. Ct. at 2356). The Court characterized the claims at issue as relating to "customizing information based on (1) information known about the user and (2) navigation data." *Id.* Likening "[t]his sort of information tailoring" to "providing different newspaper inserts based upon the location of the individual," *id.*, the Court concluded that the first aspect of the inventive concept was an abstract idea. The second aspect of the inventive concept, using "navigation data (i.e., information relating to when the user navigated to the website) to 'customize' the website," *id.*, the Court again concluded that "[t]ailoring information based[, e.g.,] on the time of day of viewing is also an abstract, overly broad concept long-practiced in our society." *Id.* at 1370.[7]

---

*Network, Inc.*, 790 F.3d 1343 (Fed. Cir. 2015); *Intellectual Ventures*, 792 F.3d 1363; *Versata Dev. Grp., Inc. v. SAP America, Inc.*, 793 F.3d 1306 (Fed. Cir. 2015).
[6] Representative claim 1 of U.S. Patent No. 7,603,382 recites:

> A system for providing web pages accessed from a web site in a manner which presents the web pages tailored to an individual user, comprising:
>   an interactive interface configured to provide dynamic web site navigation data to the user, the interactive interface comprising:
>   a display depicting portions of the web site visited by the user as a function of the web site navigation data; and
>   a display depicting portions of the web site visited by the user as a function of the user's personal characteristics.

*Intellectual Ventures*, 792 F.3d at 1368.
[7] In this regard, the observation made by the district court in *Paone v. Broadcom Corp.*, Civ. No. 15-0596, 2015 WL 4988279 (E.D.N.Y. Aug. 19, 2015), is worth noting, that (in the context of encryption technology) it was of

Turning to the second step of *Alice*, the *Intellectual Ventures* Court concluded that the claims at issue presented no inventive concept "that would support patent eligibility."[8] *Id.* at 1370. The Federal Circuit explained:

> Steps that do nothing more than spell out what it means to "apply it on a computer" cannot confer patentability. . . . Requiring the use of a "software" "brain" "tasked with tailoring information and providing it to the user" provides no additional limitation beyond applying an abstract idea, restricted to the Internet, on a generic computer.

*Id.* at 1370-71. In distinguishing *DDR*, the *Intellectual Ventures* Court offered the following analysis:

> The patent at issue in [*DDR*] dealt with a problem unique to the Internet: Internet users visiting one web site might be interested in viewing products sold on a different web site, but the owners of the first web site did not want to constantly redirect users away from their web site to a different web site. . . . The claimed solution used a series of steps that created a hybrid web page incorporating "look and feel" elements from the host web site with commerce objects from the third-party web site. . . . The patent at issue in *DDR* provided an Internet-based solution to solve a problem unique to the Internet that (1) did not foreclose other ways of solving the problem, and (2) recited a specific series of steps that resulted in a departure from the routine and conventional sequences of events after the click of a hyperlink advertisement. . . . The patent claims [in *Intellectual Ventures*] do not address problems unique to the Internet, so *DDR* has no applicability.[9]

---

no moment that "[e]ncryption, in general, represents a basic building block of human ingenuity that has been used for hundreds, if not thousands, of years." That is because [U.S. Patent No. 6,259,789] does not claim a process that can or does involve the encryption of data for some purpose that is otherwise abstract. Rather, it claims a specific method of doing so.

*Id.* at *7 (citation omitted) (emphasis omitted).
[8] Despite the "dynamic presentation of data – that is, . . . the claimed invention in 'real time' customizes the web page based on the information it knows about the particular viewer" – and despite the claimed "interactive interface," which was "broadly construed by the district court to mean 'a selectively tailored medium by which a web site user communicates with a web site information provider.'" *Intellectual Ventures*, 792 F.3d at 1369-70.
[9] But recall the "store within a store" pre-Internet analog rejected in *DDR*.

9

*Id.* at 1371 (citations omitted).

In reviewing post-*Alice* cases such as *DDR* and *Intellectual Ventures*, the court is struck by the evolution of the § 101 jurisprudence, from the complete rejection of patentability for computer programs[10] to the almost complete acceptance of such,[11] to the current (apparent) requirements that the patent claims in suit (1) disclose a problem "necessarily rooted in computer technology," and (2) claim a solution that (a) not only departs from the "routine and conventional" use of the technology, but (b) is sufficiently specific so as to negate the risk of pre-emption. *See DDR*, 773 F.3d at 1257; *Intellectual Ventures*, 792 F.3d at 1371. In other words, even though most of the patent claims now being challenged under § 101 would have survived such challenges if mounted at the time of issuance, these claims are now in jeopardy under the heightened specificity required by the Federal Circuit post-*Alice*. Moreover, it is less than clear how a § 101 inquiry that is focused through the lens of specificity can be harmonized with the roles given to other aspects of the patent law (such as enablement under § 112 and non-obviousness under § 103),[12] especially in light of the Federal

---

[10] *See, e.g.*, 33 Fed. Reg. 15581, 15609-10 (1968), and Justice Steven's dissent in *Diehr*, whose solution was to declare all computer-based programming unpatentable, 450 U.S. at 219.

[11] *State Street Bank & Trust Co. v. Signature Fin. Group, Inc.*, 149 F.3d 1368 (Fed. Cir. 1998), *abrogated by Bilski I*, in which "a computer-implemented invention was considered patent-eligible so long as it produced a 'useful, concrete and tangible result.'" *DDR*, 773 F.3d at 1255 (citing *State Street Bank*, 149 F.3d at 1373).

[12] Indeed, Judge Plager, in his dissent in *Dealertrack*, suggested that,

> as a matter of efficient judicial process I object to and dissent from that part of the opinion regarding the '427 patent and its validity under § 101, the section of the Patent Act that describes what is patentable subject matter. I believe that this court should exercise its inherent power to control the processes of litigation . . ., and insist that litigants, and trial courts, initially address patent invalidity issues in infringement suits in

10

Circuit's past characterization of § 101 eligibility as a "coarse" gauge of the suitability of broad subject matter categories for patent protection. *Research Corp. Techs., Inc. v. Microsoft Corp.*, 627 F.3d 859, 869 (Fed. Cir. 2010). Given the evolving state of the law, the § 101 analysis should be, and is, a difficult exercise.[13] At their broadest, the various decisions of the Federal Circuit[14] would likely ring the death-knell for patent protection of computer-implemented inventions,[15] a result not clearly mandated (at least not yet). On the other hand, to recognize and articulate the requisite degree of specificity - either in the equipment used[16] or the steps claimed[17] - that transforms an abstract idea into patent-eligible subject matter is a challenging task. In trying to sort

---

    terms of the defenses provided in the statute: "conditions of patentability," specifically §§ 102 and 103, and in addition §§ 112 and 251, and not foray into the jurisprudential morass of § 101 unless absolutely necessary.

*Dealertrack*, 674 F.3d at 1335. *But see CLS Bank Int'l v. Alice Corp. Pty.*, 717 F.3d 1269, 1277 (Fed. Cir. 2013), *aff'd*, 134 S. Ct. 2347 (2014).
[13] And, therefore, not an exercise that lends itself to, e.g., shifting fees pursuant to 35 U.S.C. § 285.
[14] *See, e.g., Dealertrack*, where the claim was about as specific as that examined in *DDR*, yet the Federal Circuit found the patent deficient because it did "not specify how the computer hardware and database [were] **specially programmed** to perform the steps claimed in the patent," 674 F.3d at 1333-34 (emphasis added). The disclosure of such programming details would likely nullify the ability of a patentee to enforce the patent, given the ease with which software can be tweaked and still perform the desired function.
[15] Ironically so, given the national concerns about piracy of American intellectual property.
[16] *See, e.g., SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319 (Fed. Cir. 2010), a case where the Federal Circuit found that a GPS receiver was "integral" to the claims at issue. The Court emphasized that a machine will only "impose a meaningful limit on the scope of a claim [when it plays] a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly, i.e., through the utilization of a computer for performing calculations." *Id.* at 1333.
[17] *See, e.g., DDR*, 773 F.3d at 1257-58; *TQP Dev., LLC v. Intuit Inc.*, Civ. No. 12-180, 2014 WL 651935 (E.D. Tex. Feb. 19, 2014); *Paone*, 2015 WL 4988279.

through the various iterations of the § 101 standard, the court looks to *DDR* as a benchmark; i.e., the claims (informed by the specification) must describe a problem and solution rooted in computer technology, and the solution must be (1) specific enough to preclude the risk of pre-emption, and (2) innovative enough to "override the routine and conventional" use of the computer. *DDR*, 773 F.3d at 1258-59. The pre-emption concern is generally amenable to review in the context of a motion to dismiss or for judgment on the pleadings. The second requirement, which may well involve issues of fact relating to the state of the art in the technological environment involved, is more appropriately addressed after discovery in the context of a motion for summary judgment.

## B. Claim Construction

The Federal Circuit has "never set forth a bright line rule requiring district courts to construe claims before determining subject matter eligibility." *Ultramercial, LLC v. Hulu, LLC*, 657 F.3d 1323, 1325 (Fed. Cir. 2011), vacated sub nom. *WildTangent*, 132 S.Ct. 2431 (2012). Given the gate-keeping nature of § 101, "claim construction may not always be necessary for a § 101 analysis." *Ultramercial*, 657 F.3d at 1325 (citing *Bilski II*, 561 U.S. at 611 (finding subject matter ineligible for patent protection without claim construction)). In *Bancorp*, the Federal Circuit reiterated that "claim construction is not an inviolable prerequisite to a validity determination under § 101," but it may be "desirable—and often necessary—to resolve claim construction disputes prior to a § 101 analysis, for the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter." *Bancorp*, 687 F.3d at 1273-74. In advocating for judicial efficiency, the Federal Circuit recently stated:

12

> From a practical perspective, addressing section 101 at the outset of litigation will have a number of salutary effects. First, it will conserve scarce judicial resources. Failure to recite statutory subject matter is the sort of "basic deficiency," that can, and should, "be exposed at the point of minimum expenditure of time and money by the parties and the court," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 . . . (2007) (citations and internal quotation marks omitted). Here, for example, the district court properly invoked section 101 to dismiss Ultramercial's infringement suit on the pleadings. No formal claim construction was required because the asserted claims disclosed no more than "an abstract idea garnished with accessories" and there was no "reasonable construction that would bring [them] within patentable subject matter." *Ultramercial, LLC v. Hulu, LLC*, No. 09–CV–6918, 2010 WL 3360098, at *6 (C.D. Cal. Aug. 13, 2010).

*Ultramercial*, 772 F.3d at 718-19.

The court construed certain limitations of the '527 patent in *Motivation Innovations, LLC v. Ulta Salon Cosmetics & Fragrance Inc.*, Civ. No. 11-615, 2014 WL 3704001 (July 22, 2014) ("*Ulta*").[18] Defendant at bar presents its arguments in the context of interpreting the claims in a light most favorable to plaintiff and aligning proposed constructions with those decided by the court in *Ulta*. Plaintiff makes no mention of claim construction in its briefing, relying instead on general arguments regarding the claim limitations. Accordingly, the court concludes it may proceed with a § 101 analysis.

### C. The '527 patent

The '527 patent discloses and claims methods for redeeming discount offers by associating a machine-readable identification code, such as a barcode, with data identifying items to be offered at a discount. The data is stored in a database in

---

[18] The court also issued a decision granting summary judgment of non-infringement and denying defendant's motion for summary judgment of invalidity under 35 U.S.C. §§ 102, 112. *Motivation Innovations LLC v. Ulta Salon Cosmetics & Fragrance Inc.*, 59 F. Supp. 3d 663 (D. Del. 2014).

13

memory, and the discount is provided for those items for which data is listed in the database. (4:9-32) Independent claim 1 recites:

> A method for redeeming discount offers comprising:
>
> providing a circulation medium and providing said medium with indicia which includes a machine readable identification code;
>
> causing said medium to be distributed to potential users;
>
> associating said identification code with data identifying items which are to be offered at a discount provided as part of said medium and storing said data in memory in a data base so as to be addressable by said identification code;
>
> providing means for reading said identification code provided with said circulation medium;
>
> providing means associated with said code reading means for tabulating sales of items so that any discount corresponding to an item listed in said data is deducted from the price of the item in the tabulation; and
>
> using said reading means to identify said code provided with said medium and using said means for tabulating items to obtain a price for the involved item and to cause a discount to be debited against the purchased item if the involved item is listed as part of said data identifying an item as qualifying for a discount as called for by the data base data defined by the identification code of the medium.

(9:7-30) Independent claim 17 recites:

> A method of tracking customer purchasing habits comprising:
>
> providing a circulation medium and providing said medium with indicia including a machine readable identification code means;
>
> causing said medium to be distributed to potential users;
>
> associating said identification code means with the addressee of the distributed circulation medium and with data identifying [at least one item] items to be offered at a discount;
>
> providing means for reading said identification code means provided with said circulation medium;

14

>>using a code reading means to read the identification code means and to create a data file identified by the information in said identification code means;
>
>>providing means for tabulating items and for recording the items purchased by the bearer of the circulation medium and providing means for calculating the at least one discount on the item offered at discount by said identification code means; and
>
>>tabulating items purchased and storing a record of the tabulated items in said data file identified by the identification code means thereby enabling tracking of purchasing habits of individuals who receive and use the circulation medium.

(1:26-52, reexamination certificate)

The specification describes that a point of sale ("POS") machine uses the indicia on the flyers "to identify items which are offered at a discount and then apply an appropriate credit to the purchased items." (Abstract) Moreover,

>[e]ach point of sale machine is linked to a main computer 8 which includes a controller 10 responsible for managing the data which is input to the system through the point of sale machines 4,4 as part of the normal transactions of the store. The point of sale machines are standard readily available machines each having a microcomputer unto themselves which is capable of communicating in real time with the main computer 8 of the network.

(4:53-61) The main computer includes a read only memory used to store the "discount program offered to the customer and identified by a particular code," an account memory to record "discounts on items against manufacturers offers for subsequent credit by the appropriate manufacturer and/or financial institution," and a customer reference memory to record "the name or residence address of a purchaser and for recording his or her transactions." (5:1-17)

### C. Analysis

Applying the analytical framework of *Alice*, the court first "determine[s] whether the claims at issue are directed to one of those patent-ineligible concepts," namely, laws of nature, natural phenomena, and abstract ideas. 134 S.Ct. at 2354-55. Plaintiff describes the '527 patent as "disclos[ing] a particular and specific method and system for the use and redemption of 'discount offers' (or coupons) that reduced the need for consumers and retailers to handle and process large quantities of coupons, reduced fraud, and allowed retailers to keep track of purchases made by individual consumers." (D.I. 50 at 7) Regardless of the extra limitations related to how the method is used or what it improves, the patent claims are directed to the "use and redemption" of coupons, i.e., the abstract idea of using coupons to provide discounts. *Ultramercial*, 772 F.3d at 715 ("Although certain additional limitations . . . add a degree of particularity, the concept embodied by the majority of the limitations describes only the abstract idea of showing an advertisement before delivering free content." Moreover, "any novelty in implementation of the idea is a factor to be considered only in the second step of the Alice analysis.").

Turning to step two of the Alice framework, the additional limitations of the asserted claims recite conventional or routine activity or computer technology. For example, claim 1 requires: (1) creating a circulation medium (e.g., brochure) having a UPC bar-code; (2) distributing the circulation medium to potential users; (3) associating the bar-code with a data file, which lists discounts on two or more produces; (4) using a generic bar-code scanner to scan the bar-code; and (5) using a generic point-of-sale machine (i.e., means for tabulating) to (a) determine whether a discount offered by the circulation medium should be applied to a transaction (i.e., whether an item being

16

purchased is listed in the data file), and (b) if so, adjust the sales total by the discount amount. (D.I. 46 at 14-15) The specification explains that the POS machine is a "standard readily available machine," with a microcomputer capable of communicating in real time with the main computer of the network. No special programming is disclosed. Plaintiff argues that the invention is "a specific method and system for discount offer redemptions[, containing] specific limitations;" such invention is "novel and inventive because . . . it had not been [previously] known to use a single coupon with one 'indicia' to redeem offers on multiple products, or to create and use a database of individual customer's purchasing history while doing so." (D.I. 50 at 9) The inventive concept of using a "machine readable identification code" to take discount offers and track customer purchasing habits, however, is not an internet (or computer) centric problem. Nor do the method steps lend sufficient specificity to negate pre-emption. In *Intellectual Ventures*, the Federal Circuit concluded that the elements of the asserted claims –data entry into a computer database, the "breakdown and organization" thereof, followed by the transmission of the derived information, "through the use of conventional computer components . . . operating in a conventional manner" – did not confer patent eligibility. 792 F.3d 1371. Likewise, the method at bar describes using "routine and conventional" computer technology to redeem discounts and track customer spending habits.[19] The asserted claims are invalid under 35 U.S.C. § 101.

## V. CONCLUSION

---

[19] That the method achieves the objective more quickly and efficiently than when previously carried out by hand also does not confer patent eligibility. See *Bancorp*, 687 F.3d at 1278; *CLS Bank*, 717 F.3d at 1286.

17

For the foregoing reasons, defendant's motion for judgment on the pleadings (D.I. 45) is granted. An appropriate order shall issue.